<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Crim. No.: 22-cr-576 (KSH) |
| v. | |
| LAMAR MCCULLOUGH, | **OPINION** |
| *Defendant*. | |

<u>**Katharine S. Hayden, U.S.D.J.**</u>

**I.      <u>INTRODUCTION</u>**

Lamar McCullough has been charged with Possession of Ammunition by a Convicted Felon in connection with a shooting that occurred in Newark, New Jersey on March 5, 2021. Operating on a search warrant issued by a state court judge, law enforcement searched McCullough's car on April 1, 2021, and seized a green Nike skullcap, a black Nike puffer jacket, and a purple iPhone—evidence that, in conjunction with surveillance video, supports the prosecution's case that he was on the scene and that he was the shooter.

McCullough filed a motion (D.E. 79) to invalidate the search warrant and suppress the fruits of the search, or in the alternative to conduct a hearing under *Franks v. Delaware*, 438 U.S. 156 (1978). He argues the affidavit in support of the search warrant (D.E. 83-1, Gov. Ex. A, "Aff.") contained statements that were knowingly false or made with reckless disregard for the truth. He seeks to question the affiant, detective Javier Figueroa of the Newark Police Division, about the means he used to identify McCullough in surveillance footage, relying on certain demonstrably low-quality video clips to attack Figueroa's sworn identification. In deciding, the Court has considered the parties' written submissions, the arguments made at oral argument on April 3, 2024,

and the full range of surveillance footage Figueroa reviewed in connection with his affidavit.  The Court concludes that McCullough has not met the rigorous standard required by *Franks* to invalidate the search warrant and that consequently, McCullough's motion is denied.

## II.    <u>LEGAL STANDARD</u>

In cases where evidence was obtained by search warrant, the Supreme Court has recognized a presumption that an affidavit of probable cause supporting the search warrant is valid. *Franks*, 438 U.S. at 171.  As explained by the Third Circuit in *United States v. Yusuf*, 461 F.3d 374 (3d Cir. 2006), *Franks* permits a criminal defendant to overcome this presumption of validity and challenge the truthfulness of statements made in an affidavit of probable cause at what has come to be called a *Franks* hearing if he can make two preliminary showings.

First, the defendant must "make a substantial preliminary showing that the affidavit contained a false statement, which was made knowingly or with reckless disregard for the truth." *Yusuf*, 461 F.3d at 383.  To do so, the defendant "must present an offer of proof contradicting the affidavit" and "cannot rest on mere conclusory allegations or a mere desire to cross-examine." *Id.* at 383 n.8.    To show recklessness, the defendant must show that the affiant subjectively "entertained serious doubts" or objectively "had obvious reasons to doubt" the accuracy of his statements.  *United States v. Brown*, 631 F.3d 638, 645 (3d Cir. 2011).  Even if the affiant's statement is factually incorrect, a *Franks* hearing is not appropriate if the information was "believed or appropriately accepted by the affiant as true."  *Franks*, 438 U.S. at 165.    As a fundamental premise, "[a]llegations of negligence or innocent mistake are insufficient" to warrant a hearing.  *Id.* at 171.

Assuming the first hurdle is met, the defendant must show that the deliberate or reckless false statement was "material to the finding of probable cause." *Yusuf*, 461 F.3d at 383.  If, without

the false statement, "there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Franks*, 438 U.S. at 171-72.  Should the remaining content be insufficient to establish probable cause, "the defendant is entitled . . . to [a *Franks* hearing." *Id.*

III.   <u>**ANALYSIS**</u>

The core of McCullough's challenge is Figueroa's sworn identification of him as the shooter in a video clip of the shooting incident.  His preliminary showing that Figueroa's sworn statements are deliberately or recklessly false rests on "what can be plainly gleaned from the surveillance videos themselves."  That is, the videos "are simply not of such quality that a positive identification of the individuals who appear therein is possible."  (D.E. 86, Def. Reply Br. at 2.) McCullough does not point to specific paragraphs of Figueroa's affidavit as falsely or recklessly written.  (*See* D.E. 79, Def. Mov. Br.)  Consistent with the defense theory, the Court has closely examined the paragraphs most relevant to Figueroa's specific identification of McCullough in the shooting video.  It is in paragraph 5 and its several subparagraphs that Figueroa chronicles his ultimate identification of McCullough from surveillance videos obtained from a variety of sources as they became available to him.

The Court has reviewed the cache of videos two ways:  catalogued in four separate groups based on which surveillance camera or cameras yielded the footage, and then sequenced, so the videos appear in chronological order.[1]  Having done so, the Court is satisfied that the identification

---

[1] With its opposition, the government provided surveillance footage in Exhibits C-G ("Gov. Ex.") organized by each surveillance camera.  (*See* D.E. 83, Gov. Ex. C-G.)  On April 4, 2024, following oral argument and with defendant's consent, the government provided a USB drive with condensed video clips ("Gov. Clip") re-numbering the footage in Exhibits C-G to arrange them in the order the events unfolded.

of McCullough as the shooter was not knowingly or recklessly false, and that McCullough has not overcome the presumption of validity of the search warrant.

### 1. The First Group of Surveillance Footage

Upon learning that a shooting had occurred on March 5, 2021 and that blood and shell casings had been recovered from three locations on Isabella Avenue, Figueroa went there the next day and began looking for surveillance cameras. (Aff. ¶¶ 5(o)-(q).) He obtained footage from 151 Isabella Avenue on March 6, 2021 (Gov. Ex. D; Gov. Clip 18, 20, 21), which he described as showing "unknown actors," "one wearing a light colored jacket and the other all dark clothing" "running South on Isabella Avenue" at 7:23 PM.[2] (Aff. ¶ 5(z).) Two days later, on March 8, 2021, he obtained footage from 102 Isabella Avenue (Gov. Ex. C; Gov. Clip 19, the "shooting video"), which he described as showing "an unknown actor wearing all dark clothing" shooting a victim and then walking South on Isabella Avenue towards Grove Terrace with "another actor wearing light colored jacket" at 7:22 PM. (Aff. ¶¶ 5(w), (bb).) He "was able to determine that these actors were the same actors observed running South Bound on Isabella Avenue" at 7:23 PM in the 151 Isabella Avenue footage. (Aff. ¶ 5(cc).) Two days after that, on March 10, 2021, Figueroa obtained footage from 148 Vermont Avenue (Gov. Ex. E; Gov. Clip 17, 22), which he described as showing "suspects," "one wearing all black and the other wearing light colored jacket possibly silver" walking North on Vermont Avenue at 7:12 PM and walking South on Vermont Avenue at 7:24 PM. (Aff. ¶ 5(dd).) This collection of footage from three sources makes up the first group of footage.

---

[2] Figueroa noted the time as 7:28 PM. (Aff. ¶ 5(z).) For the purposes of this motion, the Court has adjusted the time in accordance with the government's representation that the 151 Isabella Avenue videos were inadvertently timestamped approximately five minutes ahead of time. (D.E. 83, Gov. Opp. Br. at 3 n.2.)

The Court agrees with McCullough that footage in the first group of videos is of notably low quality and that each video, *standing alone*, provides insufficient detail to allow for a positive identification of either suspect. But what counts here is that the only conclusion Figueroa drew from the first group of videos was that the two men walking South away from the shooting at 7:22 PM in the 102 Isabella Avenue footage were the same two men running South at 7:23 PM in the 151 Isabella Avenue footage. (Aff. ¶ 5(cc).) The Court is satisfied that despite the low quality of the footage, Figueroa accurately described the details he could reasonably glean from each video. The similarities visible in subjects' clothing, the close proximity of the camera locations (*see* D.E. 83, Gov. Ex. B (map)), and the footage being only one minute apart provided a reasonable basis for Figueroa to make his conclusion in paragraph 5(cc).

### 2.    The Second Group of Surveillance Footage

After March 10, 2021, "[a]rmed with th[e] information" from the first group of videos, Figueroa looked for additional surveillance cameras near the shooting and located one at 889 18th Avenue[3] outside Fancy Nails. (Aff. ¶¶ 5(ee)-(ff).) After securing a search warrant for the camera, on March 12th he obtained the Fancy Nails footage that makes up the second group of videos (Gov. Ex. F; Gov. Clip. 1A-4B, 6A-7B, 10A-12B, 14, 16, 25, 26A, 26B). (Aff. ¶¶ 5(jj)-(mm).) This footage is much higher in video quality, with clear color shots of faces and clothing, and on it can be seen two men walking together and separately in the vicinity of the shooting at various times throughout the day in question.

Based on the Court's review of the Fancy Nails footage, Figueroa's descriptions in paragraph 5(mm) are accurate. He described one of the two men as wearing "a shiny silver bubble

---

[3] Paragraphs 5(ee) and 5(ff) refer to Fancy Nails footage from "886 18th Avenue" while all other paragraphs discussing Fancy Nails footage note that it is from 889 18th Avenue. The Court is satisfied that the discrepancy is an inconsequential scrivener's error.

jacket, blue sweat pants with a white logo on the upper left thigh area" and the other as "wearing a green Nike skullcap, black bubble jacket with a Nike logo on the upper left chest area, black pants, and black Nike foamposites sneakers." (Aff. ¶ 5(mm).) They are seen walking together into a residence, which Figueroa locates as between 197 and 193 Vermont Avenue, at 4:19 PM. (*Id.*) In his first description of the man wearing the silver jacket at 12:40 PM, Figueroa states this was the "same suspect who accompan[ied] the shooter at the time of the shooting incident." (*Id.*) And in his first description of the man wearing the green skullcap and black bubble jacket accompanying the suspect wearing the silver jacket at 4:19 PM, he noted that these were "both suspects observed on the surveillance video from 102 Isabella Avenue at the time of the shooting incident." (*Id.*) For approximately two pages of the affidavit, he continued to describe the activities of the two men, whom he refers to as suspects, as they walked together on Vermont Avenue at various times from 4:19 PM to 7:26 PM. (*Id.*)

Going back to the core issue, McCullough asserts that Figueroa's conclusion in paragraph 5(mm) that the men depicted in the clear Fancy Nails footage were the "suspects" depicted in the fuzzy 102 Isabella Avenue shooting video, is intentionally or recklessly false. The Court, however, is satisfied that after Figueroa reviewed clear footage from the Fancy Nails cameras that showed physical features—the individuals' clothing, height, stature, and build—and their activities— spending much of the afternoon and evening walking together in the neighborhood of the shooting—he reasonably connected them to the shooting suspects depicted in the first group of lower quality videos.

Even if a jury later disagrees with this linking up, that does not disturb what the Court finds now: Figueroa's conclusion in paragraph 5(mm) was reasonable based on the timing, locations,

and visible details in the footage available to him, and McCullough has not summoned any evidence to contradict that Figueroa subjectively believed his conclusion to be true.

### 3. The Identifying Stop

That same day, March 12th, after Figueroa had completed his review of the Fancy Nails footage, he "began to view live video from the City surveillance cameras" located near the shooting location. (Aff. ¶ 5(nn).) By happenstance, he saw the individuals he had just observed in the Fancy Nails footage (and had concluded were the two suspects from the shooting video). (*Id.*) They were in the company of the man who drove the shooting victim to the hospital. (*Id.*) Figueroa sent officers to conduct a stop. (Aff. ¶¶ 5(nn)-(oo).) Their body cameras showed McCullough identifying himself. (*See* Gov. Ex. H; Gov. Clip 27.)

So it was in paragraph 5(oo) that Figueroa made the first identification of McCullough by name: "Officers of Unit #612 were able to stop [two suspects] while wearing their Body Worn Cameras and provided me with their information which is as follows: (1) Lamar McCullough . . . (wearing green sweater, blue Jeans) – this is the male wearing the black bubble jacket with the Nike logo sign on the upper left chest area and black Nike foamposites sneakers on the surveillance video from 889 18th Avenue (fancy Nails) the night of the shooting incident . . . (2) [Individual-1] . . . (wearing blue and white  jacket/sweater and blue pants) – this is the male wearing the shiny silver bubble jacket and blue sweat pants on the surveillance video from 889 18th Avenue (fancy Nails) the night of the shooting incident." (Aff. ¶ 5(oo).)

The foregoing establishes the evolving nature of Figueroa's identification from the videos and how the accretion of detail and reasonable deductions support Figueroa's identification of McCullough as the shooter. Critically, Figueroa did not attempt to identify anyone in the low-quality videos from the first group. Rather, the Fancy Nails footage provided enough detail, clarity,

and video quality to allow for a reasonable and good faith identification of the Fancy Nails subjects.  McCullough's only counterstatement of facts to challenge paragraph 5(oo) is his own certification stating under penalty of perjury that he was "not present on any of the surveillance videos."  (D.E. 81, Def. Cert.)  Such a conclusory and self-serving statement is insufficient under *Franks*.  *See Yusuf*, 461 F.3d at 383 n.8 ("[T]he defendant cannot rest on mere conclusory allegations"); *United States v. Marinelli*, 2022 WL 3371326, at *11 (M.D. Pa. Aug. 16, 2022) ("To overcome the presumption of validity a defendant must do more than construct a self-serving statement which refutes the warrant affidavit.").  The Court is satisfied that Figueroa's statements in paragraph 5(oo) were reasonably based on the information he then had gathered from the first and second groups of footage and the identifying stop.

### 4.    The Third Group of Surveillance Footage

Later on March 12, 2021, after the identification stop, Figueroa obtained surveillance footage from a homeowner at 188 Vermont Avenue.  (Aff. ¶ 5(pp).)  Figueroa described this third group of footage (Gov. Ex. G; Gov. Clip 13, 15, 24) as showing two "suspects"—one wearing a "black jacket with a white logo on the upper left side" and another wearing a "silver bubble coat"— exiting 193 Vermont Avenue around 7:10 PM and later re-entering 193 Vermont Avenue together at 7:25 PM.  (Aff. ¶ 5(pp).)  This footage is notably low quality.  The Court is satisfied, however, that Figueroa did not attempt to make any identifications from the third group of footage, and only described what could be reasonably depicted from it.

### 5.    The Re-Review of the First Group of Surveillance Footage

Three days later, on March 15, 2021, Figueroa re-reviewed the 151 Isabella Avenue footage from the first group of videos.  (Aff. ¶ 5(rr); Gov. Ex. D; Gov. Clip 18, 20, 21.)  Now informed by the first group, the second group, the body camera footage of the identification stop, and the third

group, he noted new details: he described one suspect as wearing a "silver bubble jacket" (previously described as wearing a light colored jacket) and the other as wearing a "black sweater or coat with a white logo on the upper left side by the chest area" (previously described as wearing dark clothing) walking North on Isabella Avenue at 7:13 PM, as well as audio that captured the sound of five shots at 7:22 PM.[4]  (*Compare* Aff. ¶ 5(z) *with* Aff. ¶ 5(rr).)

The Court is satisfied based on its own review of the 151 Isabella Avenue footage that the details described in paragraph 5(rr) were reasonably visible despite the low image quality. Figueroa's observations upon his re-review were informed by the knowledge he gained from the first, second, and third group of videos, and consistent with his investigation.  He did not add details that were not visible in the footage, and he referred to the individuals depicted as "suspects" without attempting to name or identify them.  There is no evidence that he intentionally made a false statement, entertained doubts about his observations, or had obvious reasons to doubt the accuracy of his observations in paragraph 5(rr).

### 6.   The Fourth Group of Surveillance Footage

On March 17, 2021, Figueroa returned to speak to the homeowner at 188 Vermont Avenue and got additional footage from the early afternoon of the day of the shooting.  (Aff. ¶ 5(ss).) Figueroa described this fourth group of videos (Gov. Ex. G; Gov. Clip 5, 8, 9) as showing "both males Lamar McCullough and [Individual-1] enter[ing] the location of 193 Vermont Avenue through the front door which is the residence of [Individual-1]" at 4:20 PM, "[Individual-1] wearing the silver shiny bubble jacket enter[ing] through the side gate of 193 Vermont Avenue and into the rear" at 5:50 PM, and "[Individual-1] wearing the silver shiny bubble jacket exit[ing]

---

[4] Figueroa's time stamps of 7:18 PM and 7:27 PM (Aff. ¶ 5(rr)) have been adjusted by five minutes to account for the five-minute discrepancy in the 151 Isabella Avenue footage, explained *supra*.

through the side gate of 193 Vermont Avenue and walk[ing] South on Vermont Avenue" at 6:02 PM.  (Aff. ¶ 5(ss).)

The Court agrees with McCullough's argument that the low quality of the fourth group of footage could not permit a viewer to make a positive identification of McCullough and Individual-1 from this footage *alone*.  But Figueroa was not viewing this footage in isolation.  He had reviewed the first group, the second group, and the third group—all from other cameras, locations, angles, and timestamps—and learned new information from the identification stop.  The fourth group of footage, when viewed in conjunction with the other footage and information available to Figueroa by March 17th, provided a reasonable basis for him to identify McCullough and Individual-1 depicted together entering a residence near the location of the shooting.

Further, and pushing to the limits of the analysis, even if Figueroa's identification in the fourth group of footage were considered reckless, McCullough has not made the second showing required for a *Franks* hearing, materiality.  If the Court were to excise paragraph 5(ss) from the affidavit, Figueroa's other factual assertions would still support a finding of probable cause for a search warrant of McCullough's vehicle.  *See, e.g.*, *United States v. Bailey*, 2016 WL 6995067, at *24 (S.D.N.Y. Nov. 29, 2016) (denying a *Franks* hearing where the affiant made an innocent mistake in his description of a surveillance video because, even if the statement were excised from the affidavit, the affidavit would still contain sufficient information to establish probable cause); *United States v. Smith*, 2023 WL 336136, at *5 (E.D. Mich. Jan. 20, 2023) (denying a *Franks* hearing where the affiant's statements about surveillance footage were not false and, even if they had been false, were not material because the affidavit contained ample other evidence to support probable cause); *United States v. Durante*, 2012 WL 28787, at *3 n.4 (D.N.J. Jan. 5, 2012) (Chesler, J.) (concluding that even if the paragraph in the affidavit describing video surveillance

footage were excised entirely, "the other uncontroverted factual assertions in the affidavit would be more than sufficient to provide a basis for the issuance of a [search] warrant").

As explained above, Figueroa had already reasonably connected the two individuals depicted in the clear Fancy Nails footage with the two suspects from the first group of videos, including the shooting video (Aff. ¶¶ 5(cc), (mm)); identified McCullough as wearing the green Nike skullcap and black puffer jacket with a white logo in the Fancy Nails footage (Aff. ¶ 5(oo)); observed a suspect in a similar black puffer jacket with a white logo in the third group of videos (Aff. ¶ 5(pp)); and identified similar details of the black puffer jacket with a white logo in the first group of videos upon re-review (Aff. ¶ 5(rr)).  These prior observations and identifications, further supported by the observation of a green Nike skullcap plainly visible on the driver side dashboard of McCullough's car (Aff. ¶ 5(jjj)), sufficiently provided probable cause for a search warrant.

## IV.   <u>CONCLUSION</u>

McCullough has not met the rigorous standards of *Franks* in his preliminary showing, which is confined to the poor quality of some—but definitely not all—of the video surveillance supporting Figueroa's affidavit.  His motion that the Court conduct a *Franks* hearing is denied, the search warrant Figueroa obtained is deemed valid, and as a consequence the government may present the fruits of the search as evidence at McCullough's trial.  An appropriate order will be entered.